Eileen R. Johnson (ISB No. 9935)
eileen@ertzjohnson.com
Brian A. Ertz (ISB No. 9960)
brian@ertzjohnson.com
ERTZ JOHNSON LLP
P.O. Box 665
Boise, Idaho 83701
(208) 779-2929 (Telephone)
(208) 416-6665 (Fax)

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| **AHNIAH SELENE**, | Case No. |
| *Plaintiff,* | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **PARKLANE MANAGEMENT COMPANY, LLC; PARKLANE IDANHA ASSOCIATES, LLC; IDANHA ASSOCIATES, LLC; KENNETH G. HOWELL; ABC HOWELL, LLC; RENTAL HOUSING, LLC;** and **JOHN AND JANE DOES I-X** Whose Identities Are Unknown, | |
| *Defendants*. | |

COMES NOW the Plaintiff, AHNIAH SELENE, by and through his counsel, Eileen R. Johnson and Brian A. Ertz of Ertz Johnson LLP, for causes of action against Defendants, complaining and alleging as follows:

## I.  INTRODUCTION

This action seeks monetary, declaratory, and injunctive relief, alleging that Plaintiff has

been injured as a result of Defendants' repeated, ongoing, and current pattern and practice of housing discrimination on the basis of disability in violation of the Federal Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq.* Plaintiff also seeks punitive damages against Defendants to punish and deter Defendants given Defendants' wanton negligence is unconscionable and repeated, and exhibits a reckless disregard for Plaintiff's rights.

## II.  JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States, namely 42 U.S.C. §§ 3604, and 3613.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this District.

3. Based on the allegations set forth herein, the Court has personal jurisdiction over all Defendants in this action.

## III.  PARTIES

4. Plaintiff AHNIAH SELENE ("Ahniah") is now, and at all times relevant herein was, a resident of Ada County, State of Idaho.

5. Defendant PARKLANE MANAGEMENT COMPANY, LLC (hereinafter "Defendant Parklane Management") is now, and at all times relevant herein was, an Idaho limited liability company doing business in Ada County, State of Idaho.

6. Upon information and belief, Defendant Parklane Management's sole member is Rental Housing, LLC, an Idaho limited liability company doing business in Ada County, State of

Idaho.

7. Defendant Parklane Management manages the property that is the subject of Plaintiff's allegations set forth herein, located at 928 W. Main Street, Boise, Idaho.

8. Defendant PARKLANE IDANHA ASSOCIATES, LLC (hereinafter "Defendant Parklane Idanha") is now, and at all times relevant herein was, an Idaho limited liability company doing business in Ada County, State of Idaho.

9. Upon information and belief, Defendant Parklane Idanha's sole member is Rental Housing, LLC.

10. Defendant IDANHA ASSOCIATES, LLC (hereinafter "Defendant Idanha") is now, and at all times relevant herein was, an Idaho limited liability company doing business in Ada County, State of Idaho.

11. Defendant Idanha owns the property that is the subject of Plaintiff's allegations set forth herein, located at 928 W. Main Street, Boise, Idaho.

12. Upon information and belief , Defendant Idanha's sole member is Rental Housing, LLC.

13. Defendant KENNETH G. HOWELL ("Defendant Howell") is now, and at all times relevant herein was, a resident of Ada County, State of Idaho.

14. Defendant Howell is the managing member of Defendant ABC HOWELL, LLC, ("ABC Howell"), an Idaho limited liability company doing business in Ada County, State of Idaho.

15. Upon information and belief, ABC Howell is the sole member of Defendant RENTAL HOUSING, LLC ("Rental Housing"), an Idaho limited liability company doing business in Ada County, State of Idaho.

16. Defendant Howell purports to own Defendant Parklane Management.

17. At all times relevant herein, Defendant Parklane Management was acting as the agent of Defendant Howell.

18. At all times relevant herein, Defendant Parklane Management was acting as the agent of Defendant Parklane Idanha.

19. At all times relevant herein, Defendant Parklane Management was acting as the agent of Defendant Idanha.

20. At all times relevant herein, Defendants Parklane Management, Parklane Idanha, and Idanha, were acting as the agent of Defendant Rental Housing.

21. At all times relevant herein, Defendant Rental Housing was acting as the agent of Defendant ABC Howell.

22. At all times relevant herein, Defendant ABC Howell was acting as the agent of Defendant Howell.

23. Defendants Parklane Idanha, Idanha, ABC Howell, Rental Housing, and Howell are liable for the acts and omissions of Defendant Parklane Management pursuant to the doctrine of *respondeat superior*.

24. Defendants JOHN and JANE DOES ("Does") are unidentified natural persons, corporations, trusts, partnerships, joint ventures, associations, and/or any other artificial, business, or legal entity causing or contributing to Plaintiff's damages as described herein.

### IV.   STATEMENT OF FACTS

25. Plaintiff Ahniah is a person with a disability pursuant to the Fair Housing Act. Ahniah is a quadriplegic who requires the use of an electric wheelchair. Ahniah is a very active

and independent individual.

26. Ahniah rents a second-floor apartment in a six-story building located at 928 W. Main Street in downtown Boise, Idaho (the "Building" or "Idanha"), with assistance from a government low-income housing credit program.

27. Ahniah has leased the one-bedroom apartment since September 2016.

28. Aside from his wheelchair, Ahniah requires a specialized bed that operates to prevent bed sores, circulation problems, and other potentially dangerous conditions secondary to his disability.

29. Ahniah has a service dog, ("Isabella"), who requires multiple trips outside each day to relieve herself.

30. The apartment building is over a century old; thus, one must climb a stairway to reach the entrance to the building's main lobby.

31. The entrance is approximately five (5) feet above sidewalk level.

32. An electric lift is located next to the entry stairway to provide access from sidewalk level to the building's main lobby for individuals unable to use the entry stairway.

33. The building's single elevator travels between the building's basement and the sixth floor of the building but does not allow access to sidewalk level.

34. Ideally, a wheelchair-bound individual can utilize the wheelchair lift to move between the sidewalk level and the main floor of the building to reach the elevator.

35. Indeed, Ahniah relies on the elevator and wheelchair lift to live independently.

36. On or about April 3, 2017, the electric lift malfunctioned or became otherwise inoperable for a full month. On that day, Ahniah became trapped in the wheelchair lift. The doors would not open and the buttons did not work.

37. Ahniah called the building's property management company, Defendant Parklane Management, and had to leave a message for assistance because there was no answer.

38. Ahniah was later freed from the lift by Defendant Parklane Management's maintenance employee.

39. At some point, Defendant Parklane Management instructed Ahniah to use the basement freight lift as an alternative to the inoperable wheelchair lift but advised Ahniah that Defendant Parklane Management would require at least twenty-minute notice each time Ahniah intended to leave or return to the building.

40. For a full month, Ahniah was unable to come and go from his home as he pleased.

41. Naturally, Isabella had many accidents inside Ahniah's apartment because Ahniah did not have the spontaneous, around-the-clock access to the outdoors that a service dog requires.

42. To use the freight lift, Ahniah must contact Defendant Parklane Management and wait for Defendant's employee to arrive.

43. Ahniah then rides the elevator to the building's dank and dimly lit basement.

44. From there, Ahniah must carefully maneuver his wheelchair down a narrow passage way and around a sharp corner, while maneuvering to avoid the somewhat haphazardly stored miscellaneous property, maintenance equipment, beer kegs, and stacks of boxes.

45. On one occasion, the stacked items toppled onto Ahniah when his wheelchair bumped into the stack.

46. The basement freight lift consists of a platform that is scarcely larger that Ahniah's wheelchair and lacks a railing or other safety barrier.

47. Indeed, a sign posted in the freight lift explicitly states "WARNING: Employees, personnel, and all individuals are STRICTLY PROHIBITED from riding on the mechanical lift."

(Emphasis in original.)

48. The freight lift is controlled by a wall switch and requires Defendants' employee to operate it.

49. As the freight lift moves between the basement floor and the gated door to the alley next to the building, Ahniah is in danger of rolling off or falling from the platform to the basement's cement floor eight to ten feet below.

50. When Ahniah wishes to return to his home, he must again contact Defendant Parklane Management in advance, wait for Defendant's employee to arrive to lower Ahniah to the basement floor from the alley doorway, and maneuver his way back to the elevator which will take Ahniah to the second floor.

51. Between April 3, 2017 and May 5, 2017, Ahniah contacted Defendant Parklane Management on numerous occasions to ask for assistance in leaving and returning to his home, and to request immediate repair or replacement of the wheelchair lift.

52. On one occasion Ahniah's chair tipped dangerously as he exited the freight lift out to the alley because Defendant Parklane Management's employee had raised the lift too high and the back of Ahniah's chair fell off the platform, leaving Ahniah in a dangerously precarious position until Defendant's employee ran upstairs, through the lobby, down the block, and around to the alley maneuver Ahniah back onto all four wheels of his chair.

53. On other occasions, Ahniah was stranded outside of the building.

54. On one particularly cold evening when Ahniah was ill and had just returned from the hospital, Ahniah had to ask complete strangers from the bar next door to carry him and his wheelchair, weighing approximately 350 lbs., up the stairway to the main lobby of the building to reach the elevator because the wheelchair lift was inoperable.

55. Ahniah is quickly susceptible to the effects of cold temperatures due to his disability and he simply could not wait outside for Defendant Parklane Management to assist him into the building.

56. Ahniah felt humiliated each time he was forced to seek such assistance from strangers and frustrated that his repeated requests to Defendant Parklane Management for immediate repair of the wheelchair lift were seemingly disregarded.

57. Over the course of April 2017, Defendant Parklane Management was repeatedly put on notice of the impacts to Ahniah's daily life caused by ongoing and repeated mechanical malfunctions of the elevator and lift.

58. Defendant Parklane Management was on notice that its continued failure to repair or replace the wheelchair lift was depriving Ahniah of the right to the same conditions, privileges, and/or provision of services or facilities that other, ambulatory tenants enjoyed.

59. Yet, Defendant Parklane Management continued to subject Ahniah and other similarly situated tenants to dangerous, humiliating, and restrictive workarounds rather than repair or replace the wheelchair lift in a timely manner.

60. On or about May 5, 2017, the wheelchair lift began to operate, but with continued electrical malfunctions.

61. Later that same day, the building's single elevator became inoperable and was not returned to full service until approximately May 30, 2017.

62. During that time, all non-ambulatory tenants within the building were deprived of the means to travel safely between the main floor and the upper floors of the building and were instead forced to use the stairs, find another alternative, or simply stay home.

63. Because Ahniah could not use the stairs, he was trapped on the second floor.

64. Each day, Ahniah contacted Defendant Parklane Management to inquire regarding the elevator repair and to notify Defendant that the elevator outage was causing significant interruptions to Ahniah's life.

65. After approximately seven (7) days without elevator service, Defendant Parklane Management advised Ahniah that its employees could carry Ahniah and his wheelchair up and down the stairs when needed, with notice provided to Defendant.

66. On the first attempt, Ahniah was almost dropped out of his chair only three steps down from the second floor.

67. He immediately advised Defendant Parklane Management's employees that it would be too dangerous for Ahniah and the employees to continue down the stairs.

68. Ahniah was returned to the second floor where he remained.

69. After several additional days of confinement to the second floor, Defendant Parklane Management advised Ahniah that it was arranging to move Ahniah to a hotel of Ahniah's choice due to continued delay in elevator repairs.

70. Ahniah was amenable to the plan and suggested several local hotels that offered the level of accessibility Ahniah required.

71. However, Defendant Parklane Management rejected each of Ahniah's hotel suggestions due to cost.

72. On or about May 18, 2017, Defendant Parklane Management moved Ahniah to a local hotel of its choosing.

73. Unfortunately, the hotel selected by Defendant Parklane Management required a keycard to enter the building.  Ahniah could not access the card reader due to his disability and the size of his wheelchair.  Because Ahniah again had to rely on the kindness of strangers to assist

him in entering the building, he simply stayed in his room to avoid humiliation and uncertainty.

74. Ahniah's specialized bed is large and very heavy making it impracticable to relocate the bed to the hotel.

75. When Ahniah expressed concern about the hotel bed and the potential for bed sores and circulation problems, Defendant Parklane Management agreed to provide Ahniah with an "egg crate" mattress topper for the hotel bed.

76. Without his specialized bed to move and reposition him at night, Ahniah soon began to suffer skin damage, intense muscle pain, and increased spasticity. The spasticity was especially alarming because it can quickly evolve into a potentially deadly condition, autonomic dysreflexia.

77. After several days in the hotel, Defendant Parklane Management requested that Ahniah return to his apartment as the elevator was expected to be fixed within the following several days.

78. Ahniah refused to return until the elevator was operable because he feared being trapped on the second floor of the Building.

79. Ahniah advised Defendant Parklane Management of the health issues he was suffering due to the hotel mattress and again expressed the need for immediate repair of the elevator.

80. Approximately two days later, Defendant Parklane Management contacted Ahniah to advise Ahniah that the elevator had been returned to service.

81. Ahniah returned to his apartment on or about May 25, 2017 and found that the elevator was still malfunctioning.

82. The elevator continued to malfunction in this manner until approximately May 30,

2017 when it was restored to full service.

83. Notably, Defendant Parklane Management's records show that between approximately May 5 and May 30, 2017, while disabled tenants were confined to the upper floors of the building with Defendant's full knowledge, there were multiple periods of up to three or four days during which no work was being performed on the elevator due to unavailability of various parts and/or repair specialists.

84. Moreover, Ahniah was informed by a Defendant Parklane Management's employee that Defendant was choosing to forego weekend repair labor due to higher costs.

85. Since April and May 2017, the elevator and wheelchair lift have continued to malfunction or breakdown, most notably in July, August, and September 2017, and in February, November, and December of 2018.

86. On one occasion Ahniah was using the wheelchair lift when it suddenly and unexpectedly dropped to the sidewalk, severely jolting Ahniah.

87. Ahniah has also repeatedly advised Defendants that the wheelchair lift doors become stuck, and that the lift often requires the buttons inside and outside the lift to be pressed simultaneously, which is impossible for one person to do.

88. Defendant Parklane Management has blamed Ahniah for "pilot error," even when Defendant Parklane Management's employee had to free Ahniah from the lift.

89. The wheelchair lift is vented to the outside, so the occupant is subjected to the outdoor temperature.

90. The wheelchair lift is located on the west side of the building.

91. In Boise, Idaho, a person trapped in the wheelchair lift in the late afternoon in the summer months can experience temperatures quickly exceeding 100 degrees.

92. There is no insulation in the lift and in the winter months, temperatures hover around the freezing mark.

93. On November 20, 2018 a representative of Defendant Parklane Management contacted Ahniah while Ahniah was out of his home and explained that the elevator was inoperable.

94. Ahniah was forced to rely on others to retrieve personal belongings from his second story apartment so Ahniah could spend the night at a hotel.

95. The next day, on November 21, 2018, Ahniah contacted Defendant Parklane Management and explained that he would not be able to remain at the hotel due to his need for the specialized bed in his apartment.

96. Defendant Parklane Management told Ahniah that he could return to his home as the elevator was again operable.

97. After returning to his home that day, while Ahniah was preparing a dish for his church's annual Thanksgiving meal, the elevator again ceased to function.

98. When notified of the continued malfunction, Defendant Parklane Management explained to Ahniah, through counsel, that its agents would not work to fix the elevator given the Thanksgiving holiday.

99. On Thursday November 22, 2018, the elevator was still inoperable.

100. Ahniah was trapped on the second floor of the Building and unable to contribute the meal he had prepared and unable to attend his church's annual Thanksgiving meal given his inability to exit the Building.

101. On November 23, 2018, Ahniah was able to get friends and neighbors to help him move to a hotel again when a maintenance man for Parklane instructed him that, although the

elevator seemed to be working, he should stay at a hotel anyway in case problems with the elevator persisted. Ahniah's friends moved Ahniah's specialized bed to the hotel.

102. On or about November 30, 2018 Ahniah returned to his apartment as the elevator had been fixed.

103. On December 4 and 5, 2018, the elevator sporadically performed or failed to perform.

104. On December 24, 2018 Ahniah, through counsel, made request for a reasonable accommodation to Defendants requesting (1) to make such lasting fixes and repairs to both the wheelchair lift and the elevator as necessary to prevent further malfunctions; and (2) to create an anticipatory accommodation policy including:

   i. provision requiring Defendants to enter into an ongoing contract with third-party contractor setting repair of Idanha lift/elevator as time sensitive priority over any non-residential jobs in the Treasure Valley; and,

   ii. provision that Defendants procure an independent assessment of the condition of the wheelchair lift and elevator, directing contractor to identify, purchase, and retain replacement parts to have immediately on hand in Boise; and,

   iii. provision that Defendants ensure that aid be provided to ensure Ahniah has ingress/egress within 20 minutes during the entire duration of any malfunction of either lift or elevator; and,

   iv. provision that suitable and accessible alternative housing be available as close to downtown as possible; and,

   v. provision that Ahniah's healthcare prescribed bed/padding and all other medically necessary provisions be immediately transported to and from

        suitable alternative housing immediately; and,

   vi.    pre-paid transportation (Uber/Lyft or other) credit provided such that transport can be provided upon request; and,

   vii.    Defendants be immediately responsive to additional reasonable requests as necessary to afford Ahniah's independent living as the need arises.

105.    On January 4, 2018 Defendants, through counsel, denied Ahniah's request for reasonable accommodation.

106.    To Ahniah's knowledge, despite a long history of malfunctions and breakdowns of the crucial mechanical infrastructure, spanning years by some accounts, Defendants have still not taken meaningful steps to overhaul or replace the elevator and/or wheelchair ramp sufficient to prevent recurrent malfunction since the events described above.

107.    Therefore, Ahniah is certain to be denied the safe and unrestrained access to his dwelling that the building's ambulatory tenants enjoy on an ongoing basis.

108.    Defendants are jointly and severally liable for Ahniah's damages incurred as described herein.

### V.  CAUSES OF ACTION

#### FIRST CAUSE OF ACTION

**For Violations of The Fair Housing Act 42 U.S.C. § 3604**

109.    Plaintiff incorporates all preceding allegations herein by reference as though fully set forth herein.

110.    Plaintiff Ahniah has handicaps and had handicaps during his tenancy at Idahna and at all times relevant herein.

111.    Defendants have discriminated in the terms, conditions and privileges of the sale

or rental of a dwelling, and the services and facilities in connection therewith, on the basis of "handicap."

112. Defendants knew or reasonably should have known of Plaintiff Ahniah's handicaps.

113. Defendants' conduct and failures to act imposed different terms, conditions, and privileges relating to the rental of a dwelling because of handicap.

114. Defendants' conduct and failures to act denied and limited services or facilities in connection with the rental of a dwelling.

115. Defendants delayed or failed to conduct maintenance or repairs of a dwelling because of handicap.

116. Defendants denied and limited services or facilities in connection with the rental of a dwelling because of handicap.

117. Defendants engaged in conduct relating to the provision of housing or services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons with handicaps.

118. Defendants' practice of failing to replace and/or make sufficient repair to lift and elevator parts and/or facilities sufficient to prevent anticipatable recurrent malfunction actually and predictably resulted in a disparate impact on a group of persons with handicaps.

119. Accommodation of Ahniah's handicaps by making such repairs and corrections to Idanha's lift and elevator facilities such that would prevent anticipatable recurrence of lift and elevator malfunction was both reasonable and necessary to afford Ahniah an equal opportunity to use and enjoy the premises.

120. Plaintiff Ahniah requested accommodation of his handicap by working to create

an anticipatory accommodation policy, including those provisions requested on or about December 24, 2018 through counsel, which was both reasonable and necessary to afford Ahniah equal use of his dwelling.

121. Plaintiff Ahniah requested that Defendants make these reasonable accommodations.

122. Defendants, acting personally or through others, refused and continue to refuse to make reasonable accommodations of Ahniah's handicaps.

123. Defendants, acting personally or through others, engaged in and continue to engage in discriminatory housing practices.

124. As a result of the Defendants' conduct, Ahniah has suffered humiliation, loss of independence, and emotional distress resulting in anxiety, depression, irritability, insomnia, and frequent nightmares of being trapped in the lift.

125. Defendants' conduct is willful and intentional and exhibits reckless or callous indifference for Ahniah's rights.

126. Because Ahniah has been injured by Defendants' discriminatory housing practices, Ahniah is an aggrieved person.

127. Plaintiff Ahniah is entitled to actual damages, general damages, punitive damages and to recover his reasonable attorney's fees and costs pursuant to 42 U.S. Code § 3613(a)(1)(c).

## VI.  RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For a declaration that Defendants have violated the Fair Housing Act;

2. For temporary, preliminary, and permanent injunctive relief ordering Defendants to immediately, and within 24 hours of judgment or order by this Court, repair the wheelchair lift

and elevator to such condition that both be reasonably expected to function consistently and without recurrent interruption;

3. For temporary, preliminary, and permanent relief against all practices, breaches, and violations of law complained of herein;

4. For the Court to enjoin the Defendants, their officers, employees, agents, successors, and all other persons in active concert or participation with said Defendants, from failing or refusing to comply with all requirements of the Fair Housing Act and its implementing regulations;

128. For affirmative relief pursuant to U.S.C. § 3613(c) requiring the Defendants to: (a) arrange for and, along with their partners, agents, employees, assignees and all persons acting in concert with or participating with them, attend, at Defendants' own expense, training regarding fair housing obligations and reasonable accommodation obligations of housing providers under the Fair Housing Act and its implementing regulations; (b) within thirty (30) days of the entry of an order require Defendants to develop internal policies ensuring ongoing and future compliance with all requirements of the Fair Housing Act and its implementing regulations; (c) within thirty (30) days of the entry of an order to submit for the Court's approval an anticipatory accommodation policy including:

    i. provision requiring Defendants to enter into an ongoing contract with third-party contractor setting repair of Idanha lift/elevator as time sensitive priority over any non-residential jobs in the Treasure Valley; and,

    ii. provision that Defendants procure an independent assessment of the condition of the wheelchair lift and elevator, directing contractor to identify, purchase, and retain replacement parts to have immediately on

      hand in Boise; and,

    iii.    provision that Defendants ensure that aid be provided to ensure Ahniah has ingress/egress within 20 minutes during the entire duration of any malfunction of either lift or elevator; and,

    iv.    provision that suitable and accessible alternative housing be available as close to downtown as possible; and,

    v.    provision that Ahniah's healthcare prescribed bed/padding and all other medically necessary provisions be immediately transported to and from suitable alternative housing immediately; and,

    vi.    pre-paid transportation (Uber/Lyft or other) credit provided such that transport can be provided upon request; and,

    vii.    Defendants be immediately responsive to additional reasonable requests as necessary to afford Ahniah's independent living as the need arises.

5. For an award of actual damages in an amount to be proven at trial;

6. For an award of compensatory damages in an amount of $150,000.00 or a greater amount to be proven at trial;

7. For Plaintiff's reasonable costs, disbursements, and attorney's fees incurred herein pursuant to 42 U.S.C. § 3613, and/or other applicable law;

8. For punitive damages against Defendants in an amount equal to one-year gross income from residential rentals at the Idanha Building or $200,000, whichever is greater;

9. The Defendants should be jointly and severally liable for any and all damages, including an award of attorney's fees and costs, awarded in this proceeding; and,

10. For such other and further relief as to the Court deems just and equitable.

DATED this 24th day of February 2019

        ERTZ JOHNSON, LLP

        /s/ Eileen R. Johnson
        Eileen R. Johnson
        *Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues properly triable by a jury in the above-entitled matter.

DATED this 24th day of February 2019.

        ERTZ JOHNSON, LLP

        /s/ Eileen R. Johnson
        Eileen R. Johnson
        *Attorneys for Plaintiff*